Luka Pehu and others *v.* J. Kauai and others.

## SUPREME COURT—TRIAL IN BANCO—JURY WAIVED.

*Allen, Ch. J., Davis, J.*\*

LUKA PEHU AND OTHERS *vs.* J. KAUAI AND OTHERS.

THE CHARTER OF A CHURCH providing that its TRUSTEES should be elected by MEMBERS IN REGULAR STANDING, and the pastor having omitted to keep records of persons admitted to the church, or to examine those admitted, or to celebrate the rites of the Communion and Baptism, HELD, that trustees elected by such a church were not shown to be duly elected by members in regular standing according to the charter.

Chief Justice ALLEN delivered the opinion of the Court.

This case is an action of trespass, which the plaintiffs instituted against the defendants before the Circuit Judge of the 4th Judicial Circuit, who rendered judgment for defendants, from which the plaintiffs appealed.

The plaintiffs claim that they are the legally elected trustees of the church of Waimea, Island of Kauai, and that they were in peaceable possession of the church edifice on the 2d of September, 1865, and had been prior to that time, under a charter granted in accordance with the provisions of law, and that the defendants entered and took possession of the same in disregard of the express prohibition of the plaintiffs ; to all of which the defendants pleaded not guilty.

It appears in evidence, that on the 16th day of March, 1859, Luka, J. Kaehu, T. Ekaula, and Haluikoo, J. Kauai, J. Mauahinelau, and J. Nahinalua, were constituted an asso-

---

\* Judge ROBERTSON also sat at the trial, but died shortly before this decision was given. It is understood he concurred in its principles.

ciation under the name of the trustees of the church of Waimea, Kauai, and by that name may sue and be sued, and also have the usual rights in the Courts given to such corporations. They may hold real and personal property to an amount, the yearly income of which shall not exceed $5,000.

The Charter provides further, that if a vacancy should arise in the board of trustees, or if the church members should wish to depose from office any of them, then public notice shall be given of a meeting of the male members of the church in regular standing, and of those who pay two dollars per annum for the support of the pastor of the church, and the majority of the meeting may depose from office and fill vacancies as they shall please, but the seven trustees shall all be chosen from the church members in regular standing, and from those who contribute to the support of the pastor as before mentioned, but a majority must be church members. The trustees may adopt regulations for their guidance, if they do not conflict with this charter and the laws of the kingdom.

The Rev. Mr. Rowell testifies, that he has been connected with this church over 19 years, and that difficulties had arisen in the church in February and March, 1865. At this time there were vacancies in the board of trustees. A meeting was called for the election of trustees on the 27th of April following, and at this meeting five new trustees were elected. Two of the trustees named in the charter were removed, and two elected to fill the vacancy; two elected to supply the places of those absent, and one in place of a member deceased. Kauai and Kaehu were the trustees removed, and they are defendants in this suit.

This election was made by a resolution. A demand was then made of Kauai, one of the defendants, and a trustee named in the charter for the keys of the church, which he refused to deliver. Soon after, notice was issued by the said Kauai for a meeting of the male members of the church in

regular standing, for the purpose of electing five trustees. At this meeting there was a very large attendance, and a moderator nominated by Kauai was negatived by a large majority, whereupon Dr. Smith, the gentleman named as moderator, called upon the church members in regular standing to withdraw and elect trustees. Mr. Rowell called on the church members to remain, who organized a meeting and passed a resolution ratifying the election of trustees of the 27th of April; fearing lest these meetings were not regular and the election of the trustees by them illegal, another election was held on the 6th of July ensuing. A committee of the church was appointed to make a list from the records of the church of the male members in regular standing, and those who contributed the sum of two dollars for the support of the pastor. According to the usage of this church, those whose names stand on the record without censure are the members in regular standing. In pursuance of this rule, a list was made from the records of the church, beginning with its establishment in 1826.

The meeting assembled on the 6th of July, in pursuance of the notice, and passed a resolution ratifying the election of trustees made on the 27th of April. There were 71 persons present, and the vote was taken by yeas and nays, and passed unanimously.

Mr. Rowell has had the custody of the church records since he took charge of the church and society as a missionary of the American Board. He says "it has been the practice to admit members by a committee of the church, consisting of the pastor and lunas, or deacons." He further says, "that the pastor acts with such trustworthy members as he chooses in connection with the deacons." Members were examined and admitted by a vote of the committee and entered as members on the church records.

It appears further in evidence, by the testimony of Mr. Rowell, that he had resigned as pastor of the church of

Waimea in consequence of certain charges made against him by the Ecclesiastical Association of Kauai, of which he had formerly been a member, although not at this time, as he had received resolutions excluding him. He says : "There are a few on our roll of members who have not been baptized ; have not heard of such a practice elsewhere." It appears further, that on the 21st of May, the pastor of the Waimea church, and his lunas or deacons, received some 80 or 90 persons into the church. Mr. Rowell says : "We did not examine them, did not question them, as to their faith and practice ; we do not always question ; sometimes give advice.instead. None of these 80 or 90 were on the list who voted on the 6th of July, I think ; no persons were admitted to the church from July, 1862, to April, 1865, when five were received from other churches and admitted by letter prior to 1862 ; had admitted members without baptism ; had not disciplined any during this period, but had restored some. Had not admitted members during that time because the admission had become a formal ceremony, and too much relied upon, and I thought it advisable to suspend the usual ordinance. I suspended, also, keeping the records of the church, celebrating the Lord's Supper ; did not perform baptism, but should not have refused if persons had been presented."

It appears that charges had been made against Mr. Rowell, and notice was sent to him by a committee that the association would sit at Waimea on his case. He declined to appear. The action of the association was taken on his confession, and a copy of the resolutions of the Ecclesiastical Association deposing him, were delivered to him. He then resigned for a period, and ceased to act as a pastor, but subsequently he resumed the duties of pastor at the request, as he says, of the church.

By the charter the trustees are elected and removed by members of the church in regular standing, and those who

pay two dollars per annum for the support of the pastor, and the question is whether it is proved satisfactorily, that those who attended the meeting on the 6th of July, and voted were such. In the case of Parker *vs.* Mays and others, 5 Cushing, Chief Justice Shaw says, "That the church is a voluntary association, consisting of the whole or some part of the members of the society, united together by covenant or agreement, according to usages well known and generally recognized, for the purpose mainly of celebrating the Christian ordinance of the Lord's Supper, and for mutual discipline in regular church order." A church is defined also "to be a company of faithful, holy people, called by the word of God into a public covenant with Christ, and among themselves for mutual fellowship;" and this voluntary covenant has always been regarded as essential to a regular church organization by the churches, with which the church of Waimea was in association.

We have no statute which declares what constitutes a church, or members in regular standing in the church, but as Chief Justice Shaw says in the case referred to, "all these inquiries are necessarily left to usage, to the well known established and recognized customs of the country, which renders these terms intelligible and significant." By the principle of usage, the protestant churches, not episcopal, are to be governed.

In the case of Farnworth and wife *vs.* Storrs, 5 Cush., 512, the Chief Justice says : "Among the powers and privileges established by long and immemorial usage, churches have authority to deal with their members for immoral and scandalous.conduct, and for that purpose to hear complaints, to take evidence and to decide, and upon conviction, to administer proper punishment by way of rebuke, censure, suspension, and excommunication. To this jurisdiction any member entering into church covenant submits, and is bound by his consent. Upon the same principle is it that those who have

become members of an ecclesiastical association are bound by its obligations; and it may be considered the duty of the association to exercise watchfulness over the conduct and actions of its members, to whose counsel and discipline they have submitted themselves by entering into the association." [Remington *vs.* Congdon, 2 Pick., 310.] As the pastor is the influential man in deciding upon admissions to the church, it is essential that he should have not only the qualities that fit him for this high trust, but he should not be guilty of willful neglect of duty.

In reviewing Mr. Rowell's ministerial duties from July, 1862, to April, 1865, as given by himself, we find that he had not admitted any members; "for admission," as he says, "had been a formal ceremony, too much relied upon," and he thought it advisable to suspend the usual ordinance; had omitted to keep the records of the church, and above all, had neglected to celebrate the Lord's Supper, and to perform baptism, which are great ordinances of the Church by immemorial usage; but he says that he did not refuse baptism, if subjects were presented.

A church record, properly kept, is a regular statement of the admission of members, the choice of officers, and the transaction of the ordinary business of the church. Chief Justice Shaw says, in the case of Sawyer *vs.* Baldwin, [11 Pick., 493,] "that we must take notice of a usage so general as that of a church to keep a record. It is also to be considered that the law recognizes the existence and organization of a church as an aggregate body; takes notice of its acts and doings, and annexes thereto various civil rights and powers. It is in virtue of this organization, and these proceedings, that deacons are elected; and being thus elected, they are empowered and qualified by the law to sue as a corporation." The law, therefore, by necessary implication, authorizes and requires a church, by a proper officer, to keep some record of its acts.

The principles here announced by the Chief Justice, are applicable to the church at Waimea. The charter recognizes the existence of the church by placing the power to remove trustees, and to supply their places, in the hands of the church members in regular standing. It is in virtue of this organization, and these proceedings, that the trustees are elected. A record may be considered a legal necessity, to enable the church members to exercise their civil rights and powers.

Mr. Rowell does not show a proper appreciation of the importance of keeping a church record, and has neglected to keep one for some few years. After this long neglect of his ministerial duties, 80 or 90 members were admitted into the church prior to the election of trustees in July, 1865, by himself and committee. These persons were not examined nor questioned as to their faith and practice. It would appear that they were admitted without ceremony, and that any one would doubtless have been admitted who requested it, without convenant, obligation, or any realizing sense of the high responsibility assumed. All these are regarded as essential by the Protestant Churches. By the charter, the property was placed in the hands of trustees chosen from members of the church in regular standing. This was regarded as a safe trusteeship. But it would seem that the church has been practically ignored, and its influence lost; and its members had abandoned their watchfulness over each other, as well as over themselves. How strikingly in contrast is this church with those the members of which enter into a solemn convenant with God and each other "to renounce all fellowship with the unfruitful works of darkness, and to walk as the children of light, and to adorn the doctrine of God our Saviour in all things, and also to maintain mutual watchfulness over each other in the spirit of brotherly love and Christian charity," and who make an earnest effort to fulfill its requirements.

In the case of Sheldon *vs.* Congregational Parish in Easton, 24 Pick., 286, Mr. Justice Morton says, "that every congregational minister may forfeit his office by certain misfeasances and non-feasances. What these are, seems to be well settled in the numerous cases which the Court unfortunately have from time to time been called upon to decide. There are three established causes of forfeiture.

1. An essential change of doctrine.
2. A willful neglect of duty.
3. Immoral or criminal conduct."

The law declares that "morality and virtue are indispensable to the clerical character." Admit that this is an independent church, as is contended; the trustees holding the property under the charter, must be bound by its provisions and the laws of the Kingdom, and they cannot be removed except by a vote of a majority of the members of the church in regular standing. If the pastor who is at the head of the board of admission, so utterly disregards his duty as required by the usages of all the churches of this character, and which are sufficient to justify a council in dismissing him, how can there be any certainty that the persons who are reputed members are worthy to be such, or in other words, are members in regular standing. A pastor who neglects all the ordinances known to the church, would not censure members with this neglect, and if guilty of immorality would not censure members guilty of the same. Hence the rule is worthless, that all members are in regular standing who have not been censured, more especially as no discipline was exercised in the church from 1862 to 1865.

The charter means, when it imposes this responsibility upon church members of electing trustees, that they shall have qualifications according to the standard recognised and known amongst Christian churches. This church, according to the theory of its founders, had the highest requirements. It demanded the highest spiritual appreciation of the

authority of the Deity, of his holy works and teachings, as given in the Bible.

While by the Constitution it is provided that all men are free to worship God according to the dictates of their consciences, it is further provided, that this sacred privilege hereby secured shall not be so construed as to justify acts of licentiousness, or practices inconsistent with the peace and safety of the kingdom. The plaintiffs' counsel contend that "the fact that Mr. Rowell might commit an immorality would not disfranchise a majority of the church, and committing an immorality, even if proved, which it is not, is not teaching immorality."

In Chaddock *vs.* Briggs, 13 Mass., 248, the Court say: "A Minister of the Gospel, separated from the world by his public ordination, carries with him constantly, whether in or out of the pulpit, superior obligations to exhibit in his whole deportment the purity of that religion which he professes to teach. His example is always before his people and influences them far more than his preaching, if it is immoral, his preaching is worse than in vain. It is positively injurious; it is a mockery upon his sacred calling." In the case referred to above, the Court further say: "So essential is an unspotted character to the salutary administration of the Ministerial office, that even a reputation for immorality, although not supported by full proof, might in some cases be a sufficient ground for removal."

In the case of Avery, *vs.* Inhabitants of Tysingham, 3 Mass., 181, the Court say: "It is the duty of a Minister to teach by precept and example, if his example is vicious, he is worse than useless; immoral conduct is then such a misfeasance as amounts to forfeiture of his office. I do not mean to include mere infirmities incident to human nature, and to which an habitually good man is sometimes liable. Negligence also, and a willful and faulty neglect of public preaching, and of administering the ordinances, or of per-

forming other useful parochial duties, is such a misfeasance as will cause a forfeiture of office."

It is very true that it does not necessarily follow that because the pastor commits an immorality, that the church members are immoral. But when the pastor appoints the deacons, and they as a committee perpetuate that body, and when the church members are selected by that body, it becomes very essential for the pastor to have the highest qualities of the Christian character.

He has extraordinary power and influence in the formation of the church, and if he neglects any duty recognized as essential by the same church formerly, and his sister churches at all times, how can there be any assurance that this body of men are worthy of this high calling.

It appears they have neglected to celebrate the Holy Communion, a most touching and useful observance, and which is calculated by its frequent recurrence, to impress upon the mind the noble traits in the character of our Saviour. They regard baptism as unnecessary, and covenants as useless, and for aught that appears, even a declaration of belief in the Holy Scriptures. Can a church subsist under such a regime? Can it be perpetuated? Can it furnish members in regular standing such as the charter contemplated? The Court is of opinion that the church has failed entirely in its duties, and that as a body its members are not qualified for the trust imposed by the charter. It has become utterly and entirely demoralised, and it must have a new spiritual life before its members can safely elect trustees for the management of the property which is dedicated to its use and the use of the society from which it is formed.

There are many individual members in the church, undoubtedly who are good men and true to the covenant which they have assumed, but it is evident that the majority who elected the trustees have abandoned the service and

neglected the duties, calculated to promote their spiritual welfare, and which are recognized as necessary, by immemorial usage. A majority of the church have no right to break down every barrier and neglect every duty, and thereby force a minority to abandon their legitimate rights in the church edifice and other property. If they change their religious opinions and abandon the usual ordinances, so that the minority cannot enjoy the religious privileges which they had been accustomed to in the church, they should have the grace to leave the temple dedicated to the service of God, that those who remain may worship in peace as well as in spirit and in truth.

The majority claim that they are an independent church, and that there is no power above them except divine authority, and that they have full powers to manage their own affairs, and that each church is authorised to make its own laws. This is very sound doctrine if they do not encroach on the rights of others or violate the great principles of religious liberty, so that their practices shall not be inconsistent with the peace and good morals of this Kingdom and promotive of licentiousness. But they cannot in this mode obtain possession of property in derogation of the rights of others, and against what may be termed the common laws of the Kingdom.

The protestant churches which were originally formed by the missionaries are in some respects peculiar, especially in the admission of members by the pastor and deacons. In this respect they differ from the congregational churches where the admission is by a vote of the whole church. The counsel on both sides have elaborated the subject of church government as applicable to the church in question, beyond the requirement of the case. The church edifice is held by trustees under the charter, and these trustees may be removed and others elected in their places by members of the church in regular standing.

Luka Pehu and others *v.* J. Kauai and others.

Can the law then sustain a body of men in the possession of property, which is for the benefit and use of the whole society, there being no satisfactory evidence that they are members of the church in regular standing, and that they were elected by those in regular standing ?

Churches have been established here long enough to make a custom ; and when the charter provides that the trustees shall be chosen by the church members in regular standing, the Court are bound to regard only the choice which is made in conformity to the admitted usage of the churches of the same denomination.   And when the church of Waimea ceased to admit members by covenant, and neglected according to usage to celebrate the Christian ordinances, and to perform the usual ecclesiastical purposes, then there was a willful neglect of duty.   It is in evidence that they ceased for some three years prior to the election of trustees, as alleged, to be associated for the celebration of the Christian ordinances, in the usual church form and order.

The Ecclesiastical Association of Kauai had the right to inquire into the character of its members, and according to the doctrine sustained by the Congregational churches, if certain charges are proved, such as an essential change of doctrine, willful neglect of duty, an immoral or criminal conduct, it would result in dismissal in office.   Mr. Rowell had subscribed to its rules and regulations, and as long as he continued a member, was amenable to them.   I do not regard, however, their decision as conclusive : it is subject to be defeated in the courts.   In the case of Stebbins *vs.* Jennings, [10 Pick., 172,] the Court say : "It may be admitted that individuals may bind themselves by express engagement with each other for spiritual aid and mutual edification, and some obligations, binding in conscience, may arise therefrom."   In this case there were obligations, and it was clearly Mr. Rowell's duty to have followed out his first purpose of retiring from the exercise of his pastoral relations

to the church and society of Waimea. The Court can not sustain this relationship so far as it affects the right of possession or property in the church edifice. His ministerial life, from 1862 to 1865, as given by himself, has wrought a forfeiture of this relationship by the total neglect of the Christian ordinances, as recognized by the churches of the same denomination. This willful neglect on the part of the pastor was participated in by the members of the church who sustained him, and while he forfeited his office, they ceased to be members of the church in regular standing. They neglected the duties which, from time immemorial, had been regarded as obligatory. When the charter gave the power to the members of the church to elect trustees from their body, what was its true intent and meaning? It was to secure men to manage its property, who illustrated in this relationship, as well as in their lives, the religious principles which they professed. By the custom and usages of the churches, it is well known what is intended by the expression, " a member of a church in regular standing." The charter means when it imposes this responsibility upon church members of electing trustees from their number, that they have qualifications according to the received opinion of Christian churches of the same denomination.

The Court would not be understood as expressing an opinion that they would examine particular cases, but when the church, by a majority, have abandoned the obligations incurred by them, they have forfeited the rights of control over the church edifice which the charter gave them. The trustees hold the property for the religious society, and the charter recognizes no such irregularities and continued neglect of duty as have been proved in this case. It has been truly said that the Christian church is founded on the living corner stone, and is the most venerable monument of time and history. This holy and significant form, the Lord's Supper and Baptism, should be honored and sustained.

Luka Pehu and others *v.* J. Kauai and others.

They are the rites which, as some writer has said, "are to the Gospel, what marriage and legitimacy are to society, true sacraments, to maintain which every Christian should lend his enlightened and grateful support, and there cannot be a doubt that when any body of men, calling themselves a Church of Christ, cease to have faith in these sacred rites it cannot long be sustained. They were regarded as important, if not as essential, by the great founder of our religion, who said in reference to baptism "for thus it becometh us to fulfill all righteousness." And it is not wise, nor in accordance with those principles of the common law, which have reference to what constitutes a church, to disregard them.

It appears in evidence that defendants also were elected trustees by certain persons, who declared that they were members of the church in regular standing, but the Court are not satisfied that the election was in conformity to law. There is no reliable evidence either that the persons voting, or those voted for, were members of the church in regular standing. It would be unsafe as well as illegal to intrust property to persons so irregularly chosen.

The Court is of opinion that the choice of the trustees as alleged by the plaintiffs was not legal, and that the property remains under the legal control of the original trustees as named in the charter.

Judgment for defendants.

Mr. Stanley for plaintiffs.

Messrs. Judd and Jones for defendants.

Honolulu, August 7th, 1867.